32 F.3d 90
 74 A.F.T.R.2d 94-5845, 18 Employee Benefits Cas. 1870
 Sammy Joe FREEMAN, on behalf of himself and all others
similarly situated, Plaintiff-Appellee,
v.
The CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION
FUND, Defendant-Appellant.
National Coordinating Committee for Multiemployer Plans,
Amicus Curiae. (Two Cases)
 Nos. 93-2559, 94-1150.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1994.
Decided Aug. 10, 1994.
 
 ARGUED: William John Nellis, Central States, Southeast and Southwest Areas Pension Fund, Rosemont, IL, for appellant. Marcus Angelo Manos, Nexsen, Pruet, Jacobs & Pollard, Greenville, SC, for appellee. ON BRIEF: Francis J. Carey, Central States, Southeast and Southwest Areas Pension Fund, Rosemont, IL, William H. Ehlies, Greenville, SC, for appellant. Thomas L. Stephenson, Nexsen, Pruet, Jacobs & Pollard, Greenville, SC, for appellee. K. Peter Schmidt, Philip W. Horton, Vivian Lee Hobbs, David S. Eggert, Arnold & Porter, Feder & Associates, Washington, DC, for amicus curiae.
 Before HALL and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Reversed by published opinion. Judge HALL wrote the opinion, in which Judge HAMILTON and Senior Judge PHILLIPS joined.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 The Central States, Southeast and Southwest Areas Pension Fund (the Plan) appeals orders of the district court finding that members of the plaintiff class have fully vested interests in the Plan and awarding the class attorney's fees.
 
 I.
 
 2
 The Plan is a defined benefit[1] multiemployer[2] pension plan established in 1955. It provides pension benefits to employees covered by numerous separate collective bargaining agreements. Van den Bergh Foods has been a contributing employer since 1958. Its contributions to the Plan over the period 1983-1992 constituted approximately .102% (i.e. barely one dollar out of every thousand) of the total contributions to the Plan from all employers.[3] By 1992, Van den Bergh had 251 participating employees for whom it was making contributions.
 
 
 3
 In January 1992, Van den Bergh closed its plant at Greenville, South Carolina, and permanently laid off the 118 workers there. Of these 118 employees, most (74) had completed the ten years of service required for vesting of their pensions under the Plan. The remaining 44 filed this class action to determine whether they, too, should be deemed vested in whatever benefits had accrued to them and were funded as of the date of the plant closing.
 
 
 4
 On cross-motions for summary judgment, the district court ruled that the closing of the Greenville plant, which greatly reduced the number of Van den Bergh employees participating in the Plan, was a "partial termination" of the Plan, and that the employees were vested in their pension benefits to the extent those benefits were accrued and funded. There was no dispute about the current value of accrued benefits for the 44 ($218,890), but the parties disagreed over whether the accrued benefits were funded. After a bench trial, the district court found that the benefits were fully funded. In a later order, the court awarded attorney's fees of $62,000 and costs of $3,497.50. The Plan has appealed the underlying judgment and the award of fees.
 
 II.
 
 5
 Long before the enactment of the Employee Retirement Income Security Act (ERISA),[4] the Internal Revenue Code regulated pension plans. In order for a pension plan to be "qualifying" (and employer contributions deductible in the year made), the plan was required to provide for immediate vesting of accrued, funded benefits upon termination of the plan. 26 U.S.C. Sec. 401(a)(7) (1962). The purpose of this restriction was to ensure that the deductions were genuine--absent vesting of benefits at termination, surplus money in the plan could revert to the employer, and the employer could thereby achieve a long deferral of income. Though the code section spoke only of "termination," treasury regulations also provided for immediate vesting upon "partial termination" of a plan. Weil v. Retirement Plan Administrative Committee, 933 F.2d 106, 108-109 (2nd Cir.1991) (discussing legislative and regulatory history). A partial termination is a "large reduction in the work force, or a sizeable reduction in benefits under the plan." Id. at 110.[5] When ERISA was enacted in 1974, the substance of Sec. 401(a)(7) was incorporated into 26 U.S.C. Sec. 411(d)(3), as was the treasury regulation applying the old statute to "partial" terminations.
 
 III.
 A.
 
 6
 The plaintiffs can win here only if there were both a "partial termination" of the Plan and the benefits for which they seek to become vested were "funded" as of the date of the partial termination. 26 U.S.C. Sec. 411(d)(3). Because we conclude that the benefits sought were in no part "funded," and because the judgment must be reversed on that basis, we will not decide the far more momentous and perplexing issue: did a "partial termination" occur here?[6]
 
 B.
 
 7
 Even when a termination or partial termination occurs, benefits need only be paid to non-vested participants "to the extent funded as of such date [i.e. the date of the termination or partial termination]." 26 U.S.C. Sec. 411(d)(3). The statute's requirement of available funding is especially illuminating, we think. It demonstrates that "termination" benefits are not to be paid because the employees are entitled to them (else the degree of funding would be irrelevant), but rather to prevent dedicated money from reverting to the employer.[7] The notion that these plaintiffs have been deprived of something that they have already earned pervades their argument, and it is a red herring. It is perfectly lawful under ERISA for a pension plan to condition vesting on a certain term of service.[8] The question is whether these employees should receive a windfall because Congress deemed them the most worthy beneficiaries if a terminated plan had extra money lying around.
 
 
 8
 The Plan has nary a cent to spare. As of December 31, 1991, two weeks before the layoffs involved here, the current value of the Plan's assets fell $1.74 billion short of the current value of vested benefits.[9] If the current value of benefits actuarially expected to become vested is added, the shortfall tops $3 billion. Were the Plan terminated today and the carcass picked clean, there would not even be enough to pay vested beneficiaries. Withdrawing employers, and perhaps even the Pension Benefit Guaranty Corporation, would have to make up the difference. There is no money that could be used for non-vested benefits. The Plan's negative balance sheet ought to be the end of the matter.
 
 
 9
 [T]he fund has established that its liabilities exceed its assets. Because no assets were available to fund the nonvested employees' benefits, the ... partial termination had no consequences with respect to the plaintiffs' rights under ERISA.
 
 
 10
 Vornado, Inc. v. Retail Store Employees' Union Local 1262, 829 F.2d 416, 422 (3rd Cir.1987).
 
 C.
 
 11
 Nonetheless, the district court cited several factors in finding that the plaintiffs' accrued benefits were "funded"--
 
 
 12
 (1) The Plan has $11,801,374,211 in assets. By itself, this figure is meaningless. The United States has zillions of dollars of assets, but it is a far cry from being "funded." Every purchase of goods on credit increases the purchaser's assets. But his liabilities increase by at least as much, and his mere possession of the asset says nothing about his ability to incur additional liabilities.
 
 
 13
 (2) The Plan meets minimum ERISA funding requirements, and those requirements force the Plan to adjust employer contribution levels to meet "unforeseen contingencies." Both observations are true enough, but neither establishes that the plaintiffs' benefits were "funded" as of the date of the alleged "partial termination." ERISA just does not require pension plans to have enough assets on hand to meet current vested liabilities; maybe it should, but it does not. Instead, plans are permitted to "amortize" their unfunded liability with new contributions in subsequent years.[10] 29 U.S.C. Sec. 1082. The young pay more because the old did not pay enough, and, in many industries, because there are fewer and fewer young contributors per pensioner. Congress can call this purging of red ink "amortization of unfunded vested benefits" or any similarly colorless term it may choose, but a deficit by any other name is still a deficit. Suggesting that the Plan should raise its future contribution rates to pay for these plaintiffs' non-vested benefits proves just the opposite of the district court's conclusion--the money just was not there at the time of the partial termination.
 
 
 14
 (3) Van den Bergh made $621,910 in contributions to the Plan because of work performed by the plaintiffs, and the plaintiffs only want $218,890 of it in return. This argument has a seductive appeal, but it ignores the nature of the Plan. A "defined benefit plan" is not a mutual fund or some sort of conglomeration of individual accounts. The plaintiffs do not have money on deposit in the Plan; they have a contingent right to a pension from the Plan if they become eligible for it. The $621,910 paid into the Plan on account of their labor is, from an accounting standpoint, gone.[11] It has been either paid out to current benefits recipients or has been used to "amortize" some of the Plan's unfunded vested liability. That money is certainly not available to "fund" non-vested benefits.
 
 
 15
 The district court's finding that the plaintiffs' accrued non-vested benefits were "funded" is clearly erroneous. The judgment, as well as the derivative award of attorney's fees and costs, must therefore be reversed.
 
 REVERSED
 
 
 [1]
 The statute defines this type of plan by what it is not. See 29 U.S.C. Sec. 1002(35) ("[A] pension plan other than an individual account plan...."). "Individual account plan" is defined at Sec. 1002(34) as, in pertinent part, "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account [plus earnings and allocated amounts from any forfeited contributions]."
 
 
 [2]
 In pertinent part, 29 U.S.C. Sec. 1002(37)(A) defines "multiemployer plan" as
 a plan--
 (i) to which more than one employer is required to contribute,
 (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and
 (iii) which satisfies such other requirements as the Secretary [of Labor] may prescribe by regulation.
 
 
 [3]
 The actual figures were $7,204,020 in Van den Bergh contributions out of the Plan's total of $7,011,079,689
 
 
 [4]
 29 U.S.C. Sec. 1001 et seq
 
 
 [5]
 We adhere to the "significant percentage" test in determining whether a reduction in the number of participants in a plan constitutes a "partial termination," Babb v. Olney Paint Co., 764 F.2d 240, 242-243 (4th Cir.1985), though we have not attempted to identify a bright line between those percentages that are or are not "significant."
 
 
 [6]
 The "partial termination" issue in this case is simply stated. When we compute the percentage of the work force reduction to see if it is significant enough to trigger a "partial termination," 118 is our numerator, but what is the denominator: the 251 employees of Van den Bergh or the 238,354 actively employed participants in the Plan? Resolving this question is considerably more difficult than stating it, and neither the parties' nor our own research has revealed any prior case in which a position similar to the plaintiffs' has been advanced. The relevant statutes and regulations are, to put it bluntly, dreadfully drafted. E.g., 26 C.F.R. Sec. 1.413-1(a)(2), which begins,
 Section 413(b) [26 U.S.C. Sec. 413(b) ] applies to a plan (and each trust which is a part of such plan) if the plan is a single plan which is maintained pursuant to one or more agreements which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers.
 We will not venture to interpret such dense doublespeak until and unless our duty to resolve a case or controversy compels it.
 
 
 [7]
 A provision of the Plan prohibits reversion of funds to participating employers, so the purpose of the partial termination rule would not be served here whatever the outcome. See also 29 U.S.C. Sec. 1103(c)(1), which provides that, subject to listed exceptions, "the assets of a plan shall never inure to the benefit of any employer." There is an exception that permits reversions in single-employer plans if all benefits liability has been satisfied, 29 U.S.C. Sec. 1344(d)(1), but no similar exception for multiemployer plans
 
 
 [8]
 Single-employer plans may delay full vesting for up to seven years so long as partial vesting is phased in according to a schedule prescribed in 29 U.S.C. Sec. 1053(a)(2)(B). If a single-employer plan chooses all-or-nothing "cliff" vesting, ERISA requires that the cliff be encountered after no more than five years. Sec. 1053(a)(2)(A). Multiemployer plans may delay cliff vesting for up to ten years. Sec. 1053(a)(2)(C)(ii)(I)
 
 
 [9]
 In ERISA-speak, the $1.74 billion figure represents "unfunded vested benefits," 29 U.S.C. Sec. 1393(c), i.e. "the difference between the present value of vested benefits and the current value of the plan's assets." Pension Benefit Guaranty Corp. v. R. A. Gray & Co., 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984). In short, it is the plan's (negative) net worth. It must be calculated no less frequently than once a year, 29 U.S.C. Sec. 1082(c)(9), and it is used in setting future contribution levels, fixing the "withdrawal liability" of employers that leave the plan, and for regulatory oversight. The plaintiffs do not question the actuarial soundness of the Plan's calculation here, but rather argue that Sec. 1393(c) was enacted for a purpose other than to define the word "funded" in 26 U.S.C. Sec. 411(d)(3). Be that as it may, Congress did not invent out of whole cloth the concept of subtracting liabilities from assets in assessing the financial health of a person or organization
 
 
 [10]
 As of January 1, 1992, the Plan's projected amortization period was 17.8 years, providing for full funding by the fall of 2009. Though that may sound manageable, the projected amortization period as of January 1, 1985, was 17.1 years. In seven years, the Plan has not made any headway
 
 
 [11]
 One of the ways a defined benefit plan is able to provide an attractive pension at a reasonable cost per pensioner is by receiving nonrefundable contributions for persons who will move on into other jobs without becoming vested. Phillips v. Alaska Hotel & Restaurant Employees Pension Fund, 944 F.2d 509, 517 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992). Congress was most certainly aware of this feature of defined benefit plans, and it accommodated the practice through ERISA's minimum vesting requirements