Chester KOPICKI, et al., Plaintiffs,

v.

FITZGERALD AUTOMOTIVE FAM-
ILY EMPLOYEE BENEFITS
PLAN, et al., Defendants.

No. Civ. A. AW–00–2757.

United States District Court,
D. Maryland,
Southern Division.

Nov. 22, 2000.

 

Michael L. Dailey, O'Malley, Miles, Nylen & Gilmore of Calverton, MD, Ronald L. Castle, Arent Fox, Washington, DC, for Plaintiffs.

Anthony J. Trenga of Washington, DC, Robin Hardy Villanueva, Miller and Chevalier Chartered of Washington, DC, and Anthony F. Shelley, Miller and Chevalier, Chartered of Washington, DC, for Defendants.

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court are several motions submitted both parties. Of the most significant pending motions, Plaintiffs, Chester and Patricia Garner Kopicki, have moved to enjoin Defendants from denying preauthorization coverage for cancer therapies recommended to treat Mr. Kopicki's multiple myeloma. Defendants have moved for summary judgment on Count I Plaintiffs' claim for coverage and for judgment on the pleadings as to Count II–Plaintiffs' claim for breach of fiduciary duties. On November 17, 2000, the Court held a hearing on the Plaintiff's motion for a preliminary injunction. The motions have been fully briefed by all parties. Upon consideration of the arguments made in support of, and opposition to, the respective motions, the Court makes the following determinations.

## I. FACTUAL BACKGROUND

In November 1999, Chester Kopicki was diagnosed with multiple myeloma, a fatal form of blood cancer. Mr. Kopicki first underwent localized bone reconstruction and radiation therapy to treat his cancer. However, his treating physicians determined that, under the initially proscribed treatment, Mr. Kopicki would not live longer than a year. The available alternative treatments included standard chemotherapy or high dose chemotherapy followed by an autologous stem cell transplant ("HDC–AuSCT"). At best, the standard chemotherapy treatment

may have extended Mr. Kopicki's life for five years. The HDC–AuSCT treatment provided a longer life expectancy than standard chemotherapy. Based upon Mr. Kopicki's medical history and physical condition, Drs. Barlogie and Zangari, physicians from the University of Arkansas Center for Medical Science ("UMC"), recommended he undergo HDC–AuSCT treatment.

The HDC–AuSCT treatment progresses over four stages. First, the patient receives standard chemotherapy treatment. Immediately thereafter, blood stem cells are collected from the patient's bloodstream and treated in a centrifuge. At the third stage, high doses of chemotherapy are injected into the patient. Unfortunately, the high dosage of chemotherapy agents kills both normal and abnormal blood cells and, thus, weakens the patient's immune system to such an extent as to pose a serious risk of death. To avoid fatality, the fourth stage follows the next day. At this point, the previously harvested cells are infused back into the patient's bloodstream. The healthy cells treated in the harvesting process are expected to suppress the abnormal blood cells and revive the patient's immune system.

The initially recommended HDC–AuSCT treatment for Mr. Kopicki called for a tandem transplant. In a tandem transplant, the patient receives two doses of high-dose chemotherapy and two transplants of previously harvested blood stem cells. The second transplant is administered after a specified period of recovery. At the UMC, recommending the tandem transplant had become the "standard of care" because several medical studies indicated that the tandem procedure further extended the overall survival rate for multiple myeloma patients.

At the time he was recommended for the tandem HDC–AuSCT treatment, Mr. Kopicki learned of a Phase III clinical trial conducted by the UMC. The purpose of the Phase III clinical trial was to study the application of thalidomide, a drug previously used in other therapies, to tandem HDC–AuSCT treatments. Randomly-selected study participants would receive the above described tandem HDC–AuSCT treatment with the inclusion of an additional administration of thalidomide. In February 2000, Mr. Kopicki elected to participate in the study and was randomly selected to receive thalidomide as part of his treatment. Thereafter, the UMC sought a predetermination of coverage for the treatment.

During the period in issue, Mr. Kopicki's wife, Patricia Kopicki, was employed by DMF Leasing, Inc. ("DMF"). DMF is a subsidiary of JJF Management Services, Inc. ("JJF"). JJF sponsored and administrated the Fitzgerald Plan, an ERISA-covered health insurance plan. The Fitzgerald Plan provided health care coverage to the employees and dependents of JJF and its subsidiaries. Therefore, Mr. Kopicki was eligible for coverage under the Plan as a dependent of his wife.

The Loomis Company ("Loomis") served as the Benefit Services Manager for the Fitzgerald Plan. Upon receiving UMC's inquiry, Loomis referred the request for preauthorization to HealthCare Strategies, Inc ("HCS") to assess the coverage issue. In a letter dated March 10, 2000, Dr. Mayer Gorbaty, the medical director of HCS, wrote that "[t]he recommended treatment is investigational and the best we have to offer. I would recommend it." On April 18, 2000, Loomis issued an opinion that the HDC–AuSCT treatment was excluded from coverage as experimental. The next month, the Kopickis requested Loomis reconsider its decision. In support of the Kopickis' request, the UMC sent Loomis articles from a medical journal describing the treatment. During this period, Dr. Gorbaty supplemented his earlier opinion in a letter stating that "I would consider that offering high dose chemotherapy with stem cell rescue to patients with Multiple Myeloma is standard of care when patients are considered candidates for treatment." On May 3, 2000, Loomis

responded that the published medical literature failed to show that "the procedure is approved for the subject diagnosis, and that it is not investigational and/or experimental." The next day, Loomis received an oncologist's assessment from HCS opining that the HDC–AuSCT treatment was medically necessary and appropriate and supported by scientific peer review as the standard of care for myeloma patients. The UMC also sent Loomis additional medical literature and studies supporting the view that the tandem HDC–AuSCT procedure was the most favorable course of treatment and the standard treatment for myeloma patients in Mr. Kopicki's condition. On May 8, Loomis indicated that its decision may be reopened upon its receipt of estimated cost data for the HDC–AuSCT treatment. Thereafter, Loomis sent Mr. Kopicki's case to a second review company, United Review Services ("URS"). The investigator from URS recommended that Mr. Kopicki's request for coverage be approved even though the treatment is considered "investigational and may not be covered at the benefits level." URS also sent Loomis an opinion from a Dr. Steven Wolff reiterating that the peer-reviewed medical literature supported the use of tandem HDC–AuSCT as the standard of care for multiple myeloma patients.

After the UMC submitted additional documentation and altered its recommendation to a single HDC–AuSCT, Loomis recommended to Gregg Steinbarth, JJF's general counsel, that the HDC–AuSCT treatment be covered under the Fitzgerald Plan. In response, Mr. Steinbarth stated that, although the HDC–AuSCT treatment "is now commonly and customarily recognized by the medical profession as appropriate treatment for multiple myeloma....", such recognition does not prove entitlement to coverage. (Letter from Gregg Steinbarth to Loomis of July 18, 2000 Pl. Mot. Prelim. Inj. Ex. 34 at 1). Instead, Mr. Steinbarth requested Loomis continue to review the matter. In particular, Mr. Steinbarth suggested that Loomis

consider (1) whether the HDC–AuSCT treatment falls within the category of an organ or tissue transplant, (2) whether the proposed treatment is truly "medically necessary," and (3) whether the modified HDC–AuSCT procedure may be viewed as "experimental" with respect to the treatment itself or the drugs utilized, such as thalidomide. Upon further review, on August 22, 2000, Loomis denied coverage for the proposed tandem HDC–AuSCT procedure as "experimental."

In June of 2000, Mr. Kopicki underwent the first two stages of treatment, the standard chemotherapy and the harvesting of blood stem cells. The cells are ready for the final stages of the HDC–AuSCT treatment. However, the UMC will not complete the procedure without preauthorization from the insurer. If Mr. Kopicki liquidates his assets and exhausts his retirement savings, he could pay for the procedure himself. In an effort to avoid this financial plight and establish his entitlement to coverage, Mr. Kopicki filed this action against JJF requesting preliminary injunctive relief as to its denial of preauthorization.

## II. *DISCUSSION*

Essentially, three forms of the HDC–AuSCT treatment are in dispute. Plaintiffs are seeking coverage for a tandem HDC–AuSCT that involves the additional use of thalidomide. According to its motions, the insurer will not extend coverage to the proposed treatment in its entirety as part of the clinical trial nor the tandem procedure even apart from the clinical trial. Apparently, in its letter of denial, the insurer even denied the request for preauthorization for the basic HDC–AuSCT as experimental. Defendants do not dispute that Mr. Kopicki is a proper beneficiary for medical benefits under the Fitzgerald Plan, a health insurance plan subject to ERISA. Therefore, under § 502(a)(1)(B) of ERISA, Mr. Kopicki may challenge the Defendants' denial of preauthorization and

seek preliminary injunctive relief to obtain such authorization. *See* 29 U.S.C. § 1132(a)(1)(B)

### A. *Preliminary Injunctive Relief*

■ In *Blackwelder Furniture v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 195–96 (4th Cir.1977), the Fourth Circuit fashioned the controlling standard for the issuance of preliminary injunctions. "In entering a preliminary injunction, a court must consider the following *Blackwelder* factors: '(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.' " *Ciena Corp. v. Jarrard,* 203 F.3d 312, 322 (4th Cir.2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir.1991) (quoting *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991))). "The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated." *Blackwelder Furn.,* 550 F.2d at 195.

### 1. *Balance of the Hardships*

"The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to [grant injunctive relief], provided that it can be done without imposing too excessive an interim burden upon the defendant." *Blackwelder Furn.,* 550 F.2d at 194–95. Defendants concede that the balance of hardships weighs heavily in Plaintiff's favor. (Defs. Opp'n at 8). Mr. Kopicki suffers from a terminal illness. The denied treatments present the best procedures available to extend his life. While Mr. Kopicki's life is at stake, Defendants merely risk the loss of money. Thus, the balance of the hardships are decidedly in Plaintiffs's favor.

### 2. *Likelihood of Success on the Merits*

The second factor to be considered in the grant of preliminary injunctive relief is to what extent Plaintiffs can demonstrate a likelihood of success on the merits. In the instance of assessing the merits of a determination made pursuant to a plan subject to ERISA, the Court must first identify the appropriate standard of review.

### a. *Standard of Review*

■ Plaintiffs contend that *de novo* is the appropriate standard of review because the Fitzgerald Plan did not unambiguously give JJF discretionary powers to deny requests for preauthorization. JJF counters that the explicit terms of the plan vest it with such authority, and, therefore, the Court's role is limited to determining whether the decision evidences an abuse of discretion. Selecting the appropriate standard of review turns on the extent of power vested in the plan administrator. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See also Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518 (4th Cir.2000); *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017 (4th Cir. 1993). In assessing the scope of authority granted under the plan, "a reviewing court must initially decide *de novo* whether the plan's language grants the administrator discretion to determine the claimant's eligibility for benefits . . . [or] if the terms . . . indicate a clear intention to delegate final authority to determine eligibility to the plan administrator." *Feder,* 228 F.3d at 518.

■ The Fitzgerald Plan states that the "Plan Administrator has the sole authority and responsibility to review and make final

decisions on benefit adjudications, eligibility for coverage determinations, and interpretation of any and all Plan matters." (Plan Defs.' Mem. Supp.. Summ. J.Ex. A2 at art. I, § 1.4). The plain language of the plan unambiguously vests within its administrator discretionary authority to determine eligibility for benefits and to interpret the terms of the Plan. *Accord Doe v. Group Hosp. & Med. Serv.*, 3 F.3d 80, 85 (4th Cir.1993) (applying abuse of discretion standard of review when the plan at issue gave "full power and discretionary authority to control and manage the operation and administration of the Contract ... [and] all powers necessary [in] ... determining all questions relating to Employee ... eligibility and benefits"); *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 230 (4th Cir.1997) (applying abuse of discretion standard when the plan vested the administrator with "discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan."); *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir.1989) (finding discretion when, under the terms of the plan, the administrator was "empowered to decide issues of Plan interpretation.").

In circumstances where an administrator holds such discretionary powers, "[the court] must show deference to the denial of benefits ... and will reverse the administrator's denial of benefits only upon a showing of abuse of discretion." *Martin v. Blue Cross & Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1206 (4th Cir.1997). "This deferential standard of review requires that a reviewing court not disturb an administrator's decision if it is reasonable, even if this Court would have reached a different conclusion." *Feder*, 228 F.3d at 518.

Yet, even under the deferential abuse of discretion standard, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber Co.*, 489 U.S. at 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). The Fourth Circuit has stated, in the wake of a conflict of interest,

> [a court should] not act as deferentially as would otherwise be appropriate. Rather, [the court should] review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries.

*Martin*, 115 F.3d at 1206 (quoting *Doe v. Group Hosp. & Med. Servs.*, 3 F.3d 80, 87 (4th Cir.1993)). JJF not only funded the Fitzgerald plan, but also vested within itself final decision making authority to deny coverage thereunder. Essentially, when JJF denies a benefit as the administrator, it saves itself the expense of funding the request for medical treatment. As JJF receives a direct financial benefit from denying coverage, the company is operating under a conflict of interest. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3rd Cir.2000) ("[W]hen an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review."); *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 521 (6th Cir.1998) (finding that where an employer "both funds and administers the plan at issue, .... there is an actual, readily apparent conflict ...."). Thus, while *de novo* review is still not appropriate, "the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Martin*, 115 F.3d at 1206.

As evidence that Plaintiff cannot show a likelihood of success on the merits, Defendants assert several grounds to justify the denial of coverage. First, Defendants posit that since stem cell transplants are not explicitly enumerated in the Plan coverage,

such procedures are excluded. Second, Defendants contend that the proposed HDC–AuSCT treatments are experimental and investigational because the entire treatment is part of a research study; the U.S. Food and Drug Administration (FDA) has not approved the use of thalidomide for the proposed treatment of Mr. Kopicki's multiple myeloma; and the published literature indicates that the tandem HDC–AuSCT has not been proven to be effective. Third, the proposed tandem HDC–AuSCT treatment is not medically necessary because it is part of a clinical trial. Each of these arguments will be addressed below.

### b. *Explicit Enumeration of Procedure in Plan as Prerequisite to Coverage*

■ Defendants argue that autologous stem cell transplants are not explicitly listed by name as a covered benefit in the plan. Consequently, Defendants contend that, in the absence of an express provision, there is no basis to extend coverage for the procedure. While the procedure is not explicitly listed by name as a covered expense within the plan, the explicit listing of a treatment within a plan is not an absolute prerequisite to coverage. *See Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d 1291 (10th Cir.2000) (finding high dose chemotherapy to be a covered medical expense where plan did not expressly exclude expense); *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80 (4th Cir.1993) (ruling that high dose chemotherapy is included within the ambit of general coverage for chemotherapy). If the insurer intends to exclude all procedures not explicitly listed by name therein, it should clearly and unambiguously state such an intention within the plan. For example, in the Exclusions section of the policy, the insurer manifested such intention to effectuate a broad-based exclusion in the instances of routine physical examinations and visual and hearing aids by specifically stating that such charges are excluded "except as specifical-

ly provided." (Plan Defs.'s Mem. Supp. Summ. J. Ex. A.2 at 36). The only exclusionary language concerning blood or blood plasma concerns refunds or credits. The same Exclusions section makes no mention of "stem cells" or "component of bloods."

■ Equally important, the plan explicitly covers charges for "blood or blood plasma, ...radiation or chemotherapy and treatment with radioactive substances" and "blood transfusions." For instance, in *Doe*, the Fourth Circuit explicitly found that HDC falls within the general coverage provision for chemotherapy. 3 F.3d at 86–87 ("[T]reatment of blood cancer by chemotherapy and radiation is accordingly covered [where] . . . . [b]oth chemotherapy and radiation are treatments for which the [insurer's] contract provides coverage."). Likewise, from a practical standpoint, the HDC–AuSCT procedure involves the administration of chemotherapy agents with the extraction and re-introduction of the patient's blood. In the stem cell collection procedure, the blood is removed from the patient's body through one catheter line and delivered to a leukapheresis machine for segregation of the white blood cells. Contemporaneously, through a second catheter line, the remaining blood plasma is transfused back into the patient's body. Additionally, Defendants acknowledge that stems are not only the "building blocks of blood," but also, at a minimum, are "components of blood." "Ambiguity in an insurance policy exists if the policy is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning . . . ." Lee R. Russ & Thomas F. Segalla, 12 Couch on Ins. § 21:11 (3d ed.2000). Given that the plan fails to go into micro-cellular detail as to which parts of the blood are covered, a reasonable interpretation would consider the term "blood" to include not only the whole, but also the parts that comprise the whole. Thus, the terms "blood or blood plasma" and "blood transfusion" are ambiguous in their scope. In light of the

lesser deferential standard accorded to ERISA fiduciaries acting under a conflict of interest, such ambiguities are to be construed against the insurers. *See Bailey v. Blue Cross/Blue Shield of Virginia,* 866 F.Supp. 277 (E.D.Va.1994). Therefore, Plaintiffs have demonstrated a strong likelihood of showing that JJF abused its discretion in denying coverage on the basis that the autologous stem cell transplant is not explicitly listed by name as a covered benefit.

### c. *Experimental or Investigational*

Defendants argue that the proposed HDC–AuSCT procedures are experimental or investigational in the treatment of multiple myeloma. The Plan's exclusionary provision for experimental treatments provides that "[a] treatment, procedure, or therapy will be considered experimental unless at the time it is provided or performed, it is considered effective for the treatment or diagnosis of the condition ...." (Plan Defs.' Mem. Supp., Summ. J.Ex. A2 at 37). The Fourth Circuit has visited the issue of similar cancer treatments involving high dose chemotherapy conjoined with autologous transplants on several occasions. *See generally Martin v. Blue Cross & Blue Shield of Virginia, Inc.,* 115 F.3d 1201 (4th Cir.1997); *Wilson v. CHAMPUS,* 65 F.3d 361 (4th Cir.1995); *Hendricks v. Central Reserve Life Ins. Co.,* 39 F.3d 507 (4th Cir.1994); *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80 (4th Cir.1993).

In *Martin,* at the time coverage was denied, the available medical literature and the National Institutes of Health viewed the proposed high dose chemotherapy procedure as experimental in treating the ovarian cancer suffered by the plaintiff. 115 F.3d at 1207. In light of this literature combined with the total absence of testimony indicating "that this treatment [had] become the generally accepted or standard practice for treatment of [the plaintiff's cancer,]" the *Martin* court determined that the proposed cancer treatment was experimental or investigative as a matter of law. 115 F.3d at 1206–07.

Suffering from breast cancer, the plaintiff in *Wilson* sought coverage for high dose chemotherapy with peripheral stem rescue ("HDC/PSCR"), a procedure analogous to the proposed treatment at issue in the present action.[1] 65 F.3d at 362. In finding the insurer's denial of coverage to be arbitrary and capricious, the court noted "the abundant evidence [and medical opinions] that HDC/PSCR [was] gaining widespread acceptance within the medical community." *Id.* at 366. By contrast, in *Hendricks,* the court affirmed the district court's finding that HDC/PSCR was experimental or investigational in treating small cell lung cancer. 39 F.3d at 514. In coming to its conclusion, the court relied upon the testimony of medical experts and studies discrediting the effectiveness of the procedure in treating small cell lung cancer and the clinical trial's own characterization of the procedure as experimental. *Id.* at 513.

In *Doe,* the court considered high dosage chemotherapy with autologous bone marrow transplants ("HDC/ABMT")[2] in

---

1. "In PSCR, the patient's white blood cells are removed by a procedure known as leukapheresis, and are then frozen and stored so that they may be reinfused after HDC. Unlike a bone marrow transplant, which requires the patient to undergo general anesthesia, peripheral stem cells can be retrieved through a procedure similar to donating blood." Retrieval occurs via a process of "mobilization," where the dosage level of the chemotherapeutic drugs is raised in order to "mobilize" stem cells from the bone marrow into the peripheral blood. The blood is then taken out of the body and centrifuged to separate ("rescue") the stem cells, and the remainder of the blood is returned to the body." Lee R. Russ & Thomas F. Segalla, 12 Couch on Ins. § 181:8 (3d ed.2000).

2. "High-dose chemotherapy followed by autologous bone marrow transplantation (HDC/ABMT) is a procedure by which a patient's bone marrow is harvested prior to beginning high dose chemotherapy and is later replaced, thereby saving the patient from the possibly fatal side-effect of bone marrow defi-

the treatment of multiple myeloma, the same cancer afflicting Mr. Kopicki. 3 F.3d at 87. In *Doe*, the policy at issue explicitly stated that ABMT was not a covered benefit for treating multiple myeloma, but did extend coverage to chemotherapy and radiation treatments. *See id.* at 88. The insurer denied coverage for the entire HDC/ABMT treatment as a procedure "relating to" to the clearly excluded ABMT. *Id.* The court found that the insurer abused its discretion in adopting such an overbroad interpretation given that the policy explicitly covered chemotherapy and radiation treatments. *Id.*

■ The above cases teach that "an insurance policy may limit coverage depending on the type of cancer involved." *Martin*, 115 F.3d at 1207. Keeping the type of cancer in mind, "an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time." *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir.1994). In this sense, government studies and medical literature discussing the appropriateness and effectiveness of the proposed procedure in treating the cancer suffered by the plaintiff are particularly instructive in reviewing the denial of coverage.

Available medical opinions and clinical findings strongly recommending the treatment as the best available and marking a higher survival rate or advantage weigh against a finding that the treatment is experimental or investigational. *Accord Hendricks*, 39 F.3d at 512–13. The position of the Health Care Financing Administration (HCFA) on the procedure may also factor into the analysis. *Id.* Applying the above factors to the instant action and as gathered from the evidence available to the insurer at the time of its determination, the Court must determine whether the proposed procedures reasonably fall within the plan's stated definition of "experimental or investigational."

In this case, the Court must also consider the proper view for analyzing the proposed procedures. Defendants argue that the use of thalidomide and other chemotherapy agents "taints" the entire HDC–AuSCT treatment. Plaintiffs maintain that Defendants' emphasis on the use of thalidomide as a basis for denying coverage ignores its FDA-approved use for treatment of other related conditions and impermissibly fragments the HDC–AuSCT process.

In *Hendricks* and *Martin,* the Fourth Circuit rejected the plaintiffs' attempts to "fragment" their high dose chemotherapy treatments into "parts" in order to gain coverage for those phases of the treatment covered by the Plan. The insurer's argument merely represents the converse of the plaintiffs in *Hendricks* and *Martin.* Those plaintiffs advanced a patchwork approach to obtain coverage. Defendants advance a piecemeal view of the procedure in order to deny coverage. Both views fail to consider the effectiveness and nature of the entire proposed procedure in treating the cancer at issue. As the *Hendricks* court stated, "[under] the logic of a fragmented analysis, virtually any treatment, no matter how inconsistent with good medical practice, could be broken down into component parts...." 39 F.3d at 514–515. Therefore, "[t]o fragment the phases of treatment and consider each in light of the policy language produces an unrealistic and distorted analysis...." *Id.* However, the application of *Hendricks* turns on whether "the exclusion in [the] policy is defined by the entire treatment and not by a particular phase of it." 39 F.3d at 515. In the case at hand, the insurer seeks to exclude the entire treatment as experimental due to the administration of a single drug during a particular phase of the HDC–AuSCT treatment, not just the ad-

---

ciency caused by the toxic levels of chemotherapy." Lee R. Russ & Thomas F. Segalla,

12 Couch on Ins. § 181:8 (3d ed.2000).

ministration of thalidomide as a procedure explicitly excluded under the policy. Likewise, the fact that thalidomide may be FDA-approved for the treatment of a skin condition associated with leprosy does not necessarily eviscerate its potentially experimental nature in the treatment of multiple myeloma. *Accord Hendricks,* 39 F.3d at 514 (finding that "[w]hile the components of the treatment proposed are fairly well known, ... the proposed treatment was experimental or investigative"). Therefore, the proposed therapies must be viewed in their entirety to discern whether the respective treatment qualifies as experimental or investigational in the treatment of multiple myeloma.

### (1) *The Single Tandem Procedure*

■ Defendants devote most of their argument to attacking the proposed tandem and thalidomide-augmented HDC–AuSCT treatments. However, Mr. Kopicki's physician also requested preauthorization for the single HDC–AuSCT treatment. (*See* Letter from Dr. Maurizio Zangari to Loomis dated June 19, 2000, Pls.'s Mot. Prelim. Injunct. Ex. 27.). Although Defendants argue that the only procedure requested involved participation in the clinical trial, the letter clearly stated that Mr. Kopicki's

> treatment plan will be modified, due to insurance benefit limitations, to a single autologous stem cell transplant .... It is my understanding that consideration of transplant benefits for a single autologous stem cell transplant will occur upon receipt of this letter.

(*See id.*). The only response to this clear request for preauthorization was a broad-based denial of coverage. Consequently, the Court finds that Defendants denied coverage for the single HDC–AuSCT in addition to the tandem and thalidomide-augmented HDC–AuSCT procedures.

Autologous transplants have been recognized as effective treatments for multiple myeloma. *See Leonhardt v. Holden Business Forms Co.,* 828 F.Supp. 657, 661 (D.Minn.1993) ("The ABMT procedure has been used with high dose chemotherapy in the treatment of multiple myeloma for a number of years and has proven to be an effective treatment."). According to the Health Care Financing Administration (HCFA), "response rates to standard chemotherapy vary from 40% to 60% with only 5% to 10% of patients reaching a complete remission ...." Coverage and Analysis Group, Health Care Financing Admin., *Decision Memorandum for Autologous Stem Cell Transplantation (AuSCT) for Multiple Myeloma* 2 (May 31, 2000) <*http://www.hcfa.gov/quality/8b3–c3.htm*> (*hereinafter* HCFA Decision Memorandum). By contrast, medical studies have revealed that HDC–AuSCT not only raises the complete remission rate to between 20% and 30%, but also significantly extended the overall survival of subjects. *Id.* at 3. Likewise, the Blue Cross/ Blue Shield Technology Evaluation Center (BC/BS TEC) concluded that the medical evidence "was sufficient to support the conclusion that [HDC–AuSCT] improves outcomes, including the duration of survival and disease-free survival, for patients with newly diagnosed ...myeloma, when compared with conventional-dose therapy." BC/BS TEC, *Technology Assessment for AuSCT for Multiple Myeloma* 3 (April 2000) (*hereinafter* BC/BS TEC Technology Assessment).

To date, numerous clinical studies involving hundreds of patients have been conducted evaluating the effectiveness of HDC–AuSCT in multiple myeloma patients outside of the medicare population. The HCFA recognized that, according to these studies, HDC–AuSCT improves the overall survival rate and "demonstrates a statistically greater treatment benefit ...compared to standard chemotherapy" for patients with medical profiles similar to Mr. Kopicki. *HCFA Decision Memorandum* at 17. In addition to the clinical findings and the opinions of the HCFA and the BC/BS TEC, the available medical literature and expert opinions support the conclusion that the single HDC–AuSCT

treatment administered to a patient like Mr. Kopicki is effective, medically necessary, and not experimental or investigational. (See (IBMT Transplant Questions Defs.'s Mem. Supp. Summ. J. Ex. A.11) (listing multiple myeloma as one of the diseases most commonly treated by autologous stem cell transplant); (Letter from Mayer Gorbaty, M.D. to Loomis of May 1, 2000 Defs.'s Mem. Supp. Summ. J. Ex. A21) (opining HDC–AuSCT is the standard of care for multiple myeloma patients); (Letter from John A. Ellerton, M.D. to Loomis of May 4, 2000 Defs.'s Mem. Supp. Summ. J. Ex. A.23,) ("[H]igh-dose chemotherapy and stem cell rescue is medically necessary and appropriate."); (Report from James M. Considine, M.D. Defs.'s Mem. Supp. Summ. J. Ex. A.34) ("The medial profession commonly recognizes HDC–AuSCT … as appropriate treatment for patients with multiple myeloma.")). Equally important, in his response letter to Loomis, Mr. Steinbarth admits that "[i]f Mr. Kopicki meets the specified criteria [for patients where HCFA determined AuSCT to be effective] and if the proposed procedure is sufficiently similar to the basic AuSCT procedure, then the basic procedure would seem to qualify as effective." (Letter from Gregg Steinbarth to Loomis of July 18, 2000 Pl. Mot. Prelim. Inj. Ex. 34 at 4).

In the face of such overwhelming evidence, Plaintiffs have demonstrated a strong likelihood of success in establishing that a fiduciary, in the absence a conflict of interest, would not reasonably deny coverage for the single HDC–AuSCT to treat the multiple myeloma of a patient with Mr. Kopicki's medical history. Therefore, the Court finds that Plaintiffs have a strong likelihood of showing that Defendants' denial of preauthorization for the single HDC–AuSCT was arbitrary and capricious.

### (2) The Tandem HDC–AuSCT

■ Although acknowledging that existing medical opinions support the view that basic HDC–AuSCT is the standard of care of multiple myeloma patients like Mr. Kopicki, Defendants argue that the tandem HDC–AuSCT enjoys no such recognition. Absent such recognition and based upon the opinion of Dr. Considine that the tandem procedure is not a covered benefit, Defendants concluded that the tandem procedure does not qualify as a medically necessary procedure.

The Plan defines "medically necessary" as follows

Care and treatment recommended … by a physician, which is consistent with the patient's condition and accepted standards of medical practice, medically proven to be effective treatment of the condition, not conducted for investigative, educational, experimental, or research purposes, and is the most appropriate level of service that can safely be provided to the patient.

(Plan Defs.'s Mem. Supp. Summ. J. Ex. A.2 at 66).

Even given the established increased remission and survival rates for patients receiving HDC–AuSCT, a majority of myeloma patients in the advanced stages of the disease experience a relapse. BC/BS TEC Technology Assessment at 3. The medical community had suggested that tandem transplants would prevent such relapses by destroying residual malignant cells. Three studies have evaluated the effectiveness of tandem HDC–AuSCT compared to single HDC–AuSCT. BC/BS TEC Technology Assessment at 3 (citing Desikan, K.R. et al., Recent Advances in the Treatment of Multiple Myeloma (1999); Barlogie, B. et al., Total Therapy with Tandem Transplants for Mewly Diagnosed Multiple Myeloma, 93 Blood 55–65 (1999); Barlogie, B., Superiority of Tandem Autologous Transplantation over Standard Therapy for Previously Untreated Multiple Myeloma, 89 Blood 789–93 (1997)). The 1999 Barlogie study involved 140 multiple myeloma patients and reported a 42% overall survival rate. The 1997 study found that the recipients of the tandem procedure achieved partial remission rates

of 85%. (Letter from UMC to Loomis, Defs.'s Mem. Supp. Summ. J. Ex. A.24). The trials indicated that tandem transplants increased the rate of complete remission up to 50%. (Clinical Results & Information, Defs.'s Mem. Supp. Summ. J. Ex.A.12 at 1.).

The recent BC/BS TEC Technology Assessment and HCFA Decision Memorandum found this research to be insufficient to make a coverage determination for Medicare patients. These determinations were made with the view of applying the treatment to the Medicare population, those over the age of 65. Neither the BC/BS TEC Technology Assessment nor the HCFA Decision Memorandum considered the applicability and effectiveness of the treatment for those patients with Mr. Kopicki's medical profile (under the age of 65 with a recent onset of the disease). In 1998, the BC/BS TEC concluded that the then available medical evidence was insufficient to determine whether the tandem procedure produced superior results to the single HDC–AuSCT procedure. Yet, this determination was made prior to the two clinical studies performed in 1999. Therefore, the opinion may not reflect the current state of medical knowledge.

Despite the general agreement as to the benefits of the single HDC–AuSCT, the available medical opinions are similarly split on the issue of the tandem HDC–AuSCT. Dr. Considine relied on the HCFA decision memorandum in concluding that the tandem HDC–AuSCT procedure was still investigational or experimental. The physicians from the UMC rely on the recent medical studies to demonstrate the effectiveness and non-experimental nature of the tandem HDC–AuSCT. (*See* Pl.'s Mot. Prelim. Inj. Ex. 15 Letter from Dr. Guido Tricot).

Defendants also maintain that language in the Phase III clinical trial consent form demonstrates that the tandem HDC–AuSCT treatment is experimental. In some instances, the language of a consent form may support a finding that a procedure is experimental. *See Martin,* 115 F.3d at 1208 (consent form stated that proposed treatment was investigational part of research study and only used for a few patients); *Hendricks,* 39 F.3d at 513–14 (consent form stated that "the treatment may not help [the plaintiff] and that his only benefit may be contributing to the 'advancement of science.' "); *Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d 1405, 1411 (5th Cir.1994) (consent "form repeatedly stated that the subject was part of a 'research project', 'research study' or 'research protocol' and that the 'safety and efficacy of this two-step approach in the treatment of breast cancer will be evaluated.' "). Here, the language in the Phase III clinical trial consent form, relied upon by Defendants, states: "You should understand that both treatment arms, although extensively studied at [the UMC], are still considered experimental at many institutions." (Phase III Clinical Trial Consent Form Defs.'s Mot. Summ. J, Ex. F at 21). The Court finds that this language merely reiterates the previously discussed controversy, that, for some populations of multiple myeloma patients, there has been no on-point medical research establishing the effectiveness of the tandem Au–SCT. By contrast, the supportive medical research, to date, has examined multiple myeloma patients with medical profiles similar to Mr. Kopicki. Given the recent nature of the studies performed in 1999 and the apparent split in the medical community as to the superiority of tandem HDC–AuSCT as oppose to a single HDC–AuSCT, the Court concludes that resolution of this matter is not immediately apparent at this stage of the litigation.

██ Nonetheless, a plaintiff's entitlement to preliminary relief is not wholly conditioned upon a showing of a "likelihood of success." *See Blackwelder Furn.,* 550 F.2d at 194. Instead, the proper analysis instructs "the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of

hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced . . . ." *Id.* at 195. In circumstances such as those Mr. Kopicki is facing, "[u]ndoubtedly the harm to the plaintiff would [be] enormous, indeed fatal, were the injunction denied, and the harm to the [Defendants] if granted, while it may not [be] negligible, [is] measured only in money and [is] inconsequential by comparison." *Todd by Todd v. Sorrell,* 841 F.2d 87, 88 (4th Cir.1988). Given that Mr. Kopicki suffers from a terminal illness with a strong likelihood of ending his life expeditiously, "considerable weight is given to the need of protection to the plaintiff as contrasted to the probable injury to the defendant." *Id.* at 88 n. 2 (quoting *Blackwelder Furn.,* 550 F.2d at 193).

Furthermore, the initial denial letter from Loomis quite briefly denied coverage for the tandem HDC–AuSCT as experimental. The next day, in responding to Mr. Kopicki's request for reconsideration, Defendants' proffered reasons for denying the tandem procedure expanded to include that the procedure was not medically necessary and was not an explicitly listed benefit. Under the less deferential standard accorded to administrators acting in the presence of a conflict, "[s]uch abrupt shifts in position . . . without elaboration or justification are clear indicia of capriciousness." *Velez v. Prudential Health Care Plan,* 943 F.Supp. 332, 343 (S.D.N.Y. 1996). The available published medical studies, conflicting opinions among medical experts, and apparent change in reasoning for denying coverage raise questions "going to the merits, so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder Furn.,* 550 F.2d at 195; *see Velez v. Prudential Health Care Plan,* 943 F.Supp. 332 (S.D.N.Y.1996) (granting preliminary injunctive relief to multiple myeloma patient seeking tandem HDC–ABMT where terms of plan reasonably included procedure).

In the preliminary injunction analysis, "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir.1991). It is appropriate to grant injunctive relief where "there is a probable right and an undoubted danger, and the need of protection to the plaintiff outweighs any probable injury to the defendant." *Todd by Todd,* 841 F.2d at 88 n. 2. There is no dispute that multiple myeloma can swiftly take Mr. Kopicki's life without the proper treatment. Published medical studies identify the tandem HDC–AuSCT as the most efficacious course of treatment to save Mr. Kopicki's life. At worst, Defendants will lose money. In light of the applicable lesser deferential standard, the Court finds that such evidence indicates that a plan administrator, acting in the absence of a conflict of interest, would not reasonably deny a terminally-ill cancer patient coverage for a life-saving treatment based primarily upon medical literature that expressly limits its opinion to people outside of that patient's class. The Court finds such denial to be particularly suspect where several published medical studies attest to the efficacy and medically necessity of the procedure for patients afflicted with multiple myeloma that are similar to Mr. Kopicki. As to the final element, the public interest clearly favors the preservation of life and a patient receiving medical benefits to which he is entitled. *Accord Dozsa v. Crum & Forster Ins. Co.,* 716 F.Supp. 131, 140 (D.N.J.1989). Given that JJF denied preauthorization while under a conflict of interest and the fatal consequences for Mr. Kopicki flowing from that denial, the Court finds that Plaintiffs have demonstrated an entitlement to preliminary injunctive relief to prevent Defendants from denying preauthorization for the tandem HDC–AuSCT treatment.

### (3) *Participation in Phase III Clinical Trial*

The final proposed treatment, in its entirety, involves a tandem HDC–

AuSCT with the introduction of thalidomide under the auspices of a Phase III clinical trial. In a Phase III clinical trial, the proposed treatment regime is compared to the conventional course of treatment to measure relative effectiveness in treating the disease in question. At this final stage, the treatment has undergone Phase II studies where its effectiveness in treating the disease is tested.[3] In *Wilson,* the court found that the total absence of Phase III clinical trials on the therapy in question did not justify a categorical determination that such a procedure was experimental or investigational. 65 F.3d at 365–66. Rather, the court found that "a therapy could become standard practice in the medical community before it had been proven more effective than traditional treatment ....where a highly promising treatment for a terminal illness is known to be harmless, but has yet to be proven efficacious in prospective, randomized testing." *Wilson,* 65 F.3d at 366. Considering that the total lack of Phase III clinical trials is not controlling on the issue, actual participation in such trials does not mandate a finding that the procedure is experimental or not medically necessary as a matter of law. *See Adams v. Blue Cross/ Blue Shield of Maryland, Inc.,* 757 F.Supp. 661, 675 (D.Md.1991) ( "[M]any of today's accepted medical treatments are offered under a research protocol. Given the definition of 'experimental' under the plan, the fact that the treatment is administered as part of an experimental protocol designed to facilitate the collection of data does not necessarily mean that the treatment is by definition experimental."). Rather, the appropriate inquiry in assessing whether the procedure may be properly characterized as experimental or investigational involves a review of the language of plan, the consent form, the protocol, the available medical literature, and the number of prior patients subjected to the procedure. *See Martin,* 115 F.3d at 1206 (finding HDC/PSCR to be experimental where less than five woman had received the treatment for ovarian cancer); *Hendricks,* 39 F.3d at 514 (finding HDC/PSCR to be experimental where plaintiff was the first patient in state to receive the treatment for small cell lung cancer).

The Plan at issue here states that, in reviewing whether a treatment is experimental or investigational, the plan administrator should consider if "Reliable Evidence shows that the ... medical treatment ...is the research, experimental, study, or investigational arm of ongoing phase III clinical trials, or is otherwise under study to determine its ...safety, its efficacy or its efficacy as compared with a standard means of treatment or diagnosis ...." (Plan Defs.'s Mem. Supp. Summ. J. Ex. A.2 at 63). The plain language of the policy speaks to the proposed tandem HDC–AuSCT with thalidomide. The consent form not only describes the trial as a "research study," but also commands the patient to "understand that this study involves research." (Phase III Clinical Trial Consent Form Defs.'s Mem. Supp. Summ. J. Ex. F.). The expressed purpose of the study is "to evaluate whether 'anti-angiogenesis' therapy with thalidomide ...will be beneficial" and "to gather biologic information from patients who have myeloma." (*Id.*). Most importantly, the consent form states that "it can not be guaranteed that you will benefit if you participate in this study. The treatment you receive may even be harmful." (*Id.*). The Fourth Circuit has found that such language reveals the experimental nature of a proposed treat-

**3.** Clinical trials progress over three phases. "[A] Phase I study is conducted to determine the toxicity of differing dose-schedules of chemotherapy. Testing then begins via a Phase II analysis, where efficacy is determined by identifying those tumors which respond. The final stage is Phase III testing, where superiority is evaluated through the direct comparison of the new treatment to standard therapy." William Giese, M.D., *Adjudication of Third Party Payment for High Dose Chemotherapy & Bone Marrow Rescue in The Treatment of Breast Cancer,* 1 DePaul J. Health Care L. 205, 208 (1996) (citations omitted).

ment. For instance, the *Hendricks* court found language describing the procedure as a "new treatment" performed "under controlled conditions in order to discover an unknown effect" supported a finding that the proposed treatment was experimental or investigational. 39 F.3d at 513–14. The court also noted that the consent form's statement that the procedure may not benefit the patient as telling of its experimental purpose. *Id.* at 514. The similarities in the language between the consent form in *Hendricks* and the form at issue here reasonably supports the Defendants' finding that the Phase III clinical trial is experimental. Furthermore, it is undisputed that the use of thalidomide in treating multiple myeloma is new. (*See* Phase III Clinical Trial Consent Form Defs.'s Mem. Supp. Summ. J. Ex. F.). The UMC's own literature on the use of thalidomide categorized the treatment under "novel anti-myeloma therapies." (Defs. Ex. 12 at 3).

At this early stage in the litigation and on the current record, the Court believes that Plaintiffs have a minimal likelihood of success in showing that JJF abused its discretion in determining that Mr. Kopicki's proposed participation in the thalidomide-augmented HDC–AuSCT clinical trial was experimental or investigational and, therefore, subject to the plan's exclusionary provision. Unlike the tandem HDC–AuSCT, the proposed thalidomide-augmented HDC–AuSCT does not have published medical studies attesting to its effectiveness in treating multiple myeloma that could raise serious questions to support a grant of preliminary injunctive relief. Accordingly, the Court denies Plaintiff's motion for preliminary injunctive relief as to preauthorization for his participation in the Phase III clinical trial. Accordingly, the Court shall limit its grant of preliminary injunctive relief to ordering Defendants to preauthorize coverage for the tandem HDC–AuSCT so that Mr. Kopicki may receive this effective and medically necessary life-saving treatment.

**B.** *Defendants' Motion for Summary Judgment*

 Defendants have moved for summary judgment as to Counts I and II of Plaintiff's claim. Plaintiffs contend that summary judgment is not appropriate at this juncture given the lack of discovery. Ordinarily, "[a] district court should refuse to grant summary judgment when an opposing party needs additional time to complete discovery and properly respond to motion." *HealthSouth Rehabilitation Hosp. v. American Nat. Red Cross,* 101 F.3d 1005, 1009 (4th Cir.1996); *see also Taft v. Vines,* 70 F.3d 304 (4th Cir.1995). "Rule 56(f) [provides] that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court's discretion to deny summary judgment in favor of allowing discovery is particularly appropriate when a party properly requests such additional time in accordance with Rule 56(f). *See Pine Ridge Coal Co. v. Local 8377, United Mine Workers,* 187 F.3d 415, 422 (1999); *Nguyen v. CNA Corp.,* 44 F.3d 234 (4th Cir.1995). Here, Plaintiffs have attached a supporting affidavit from their attorney, Michael L. Dailey, that highlights discrepancies in Defendants' exchange of documents that may be significant to resolution of this matter. In the affidavit, Mr. Dailey states that he had no access to the very plan document that is in dispute and many other exhibits submitted with Defendants' motion for summary judgment until its filing. Furthermore, Mr. Dailey states that he has not been provided access relevant correspondence among Defendants, Loomis, and JJF's reinsurance carriers that may demonstrate the influence of improper considerations in the denial of Mr. Kopicki's claim. Plaintiffs also allege that Defendants have been reluctant to include certain adverse documents in the administra-

tive record, such as the letter from Loomis recommending preauthorization for Mr. Kopicki's proposed treatment. The Court believes that these incidents raise serious questions as to the completeness of the administrative record and whether the current record accurately reflects that information at Defendants's disposal in making its determination. The Court believes that discovery will be beneficial in clarifying the extent of the administrative record and will facilitate a full and fair review of Mr. Kopicki's claim. Therefore, the Court denies Defendants' motion for summary judgment without prejudice as to Count I and Defendants' motion to consolidate given Plaintiffs' justifiable need for additional discovery.

## C. *Defendants' Motion for Judgment on the Pleadings on Count II*

As to Count II, Plaintiffs alleged that JJF breached its fiduciary duties by improperly interceding in Loomis' investigation of Mr. Kopicki's request for preauthorization and denying him coverage without fair consideration of the available medical evidence in order to advantage of its own financial interests. According to Plaintiffs, this alleged conduct violated § 404(a)(1) of ERISA which states, in pertinent part, that "a fiduciary shall discharge his duties . . . solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries. . . ." 29 U.S.C. § 1104(a)(1)(A). Defendants contend that a claim for a breach of fiduciary duty cannot be exclusively based in the denial of benefits for a single claim. Defendants also argue that .Plaintiffs' claim for breach of fiduciary duties must fail because § 502(a)(2) of ERISA does not provide relief that exclusively benefits the plan beneficiary as opposed to the plan.

■ Section 502(a)(2) empowers plan participants, beneficiaries, or fiduciaries with a private cause of action on behalf of the plan for breaches of the fiduciary

duties imposed by § 409 of ERISA. 29 U.S.C. §§ 1109(a); 1132(a)(2). In *Varity Corp. v. Howe*, 516 U.S. 489, 490, 116 S.Ct. 1065, 1067, 134 L.Ed.2d 130 (1996), the Supreme Court held that "§ 502's structure suggests that Congress intended the general 'catchall' provisions of subsections (3) and (5) to act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." However, "[w]hen a beneficiary simply wants what was supposed to have been distributed under the plan, the appropriate remedy is § 502(a)(1)(B)." *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1335 (5th Cir.1992) *quoted in Coyne & Delany Co. v. Blue Cross & Blue Shield,* 102 F.3d 712, 715 (4th Cir.1996). Thus, a plan beneficiary cannot merely recast a claim predicated upon the fiduciary's alleged mishandling of an isolated claim for coverage in the form of a breach of duty. *Coyne,* 102 F.3d at 714–15. Rather, the allegations, if proven true, must establish a breach of fiduciary duty independent of the contested denial of benefits. *See Smith v. Sydnor,* 184 F.3d 356, 357 (4th Cir.1999). In *Smith,* the Fourth Circuit stated that "a claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of *an ERISA-regulated plan* rather than upon an interpretation and application of *ERISA.*" 184 F.3d at 362 (emphasis in original).

■ In the present action, Plaintiff's allegations stem from JJF's interpretation and application of the Fitzgerald Plan, namely its failure to give fair consideration to the available medical evidence. In *Coyne,* the court rejected a similar argument that an unreasonable denial of coverage amounted to a breach of fiduciary duty under § 404(a)(1). 102 F.3d at 715. This Court is equally unpersuaded. The alleged failure to give fair consideration to Mr. Kopicki's request for pre-authorization does not amount to a breach of the duties owed to the plan under ERISA. *See Wil-*

*liam v. Caterpillar, Inc.*, 944 F.2d 658, 665 (9th Cir.1991) (stating that section 502(a)(3) of "ERISA is limited to relief protecting the integrity of the plan as a whole and does not extend to individual plan participants."). Instead, Plaintiffs' allegations of breach of fiduciary duty rest upon complaints contesting JJF's handling of his individualized claim rather than a systemic injury to the plan as a whole. Such grievances properly fall under the protections afforded by § 502(a)(1)(B) of ERISA. *See Forsyth v. Humana*, 114 F.3d 1467, 1475 (9th Cir.1997) ("Equitable relief under section 1132(a)(3) is not 'appropriate relief' [when] section 1132(a)(1) provides an adequate remedy in [the] case."); *Wald v. Southwestern Bell Customcare Medical Plan*, 83 F.3d 1002, 1006 (8th Cir.1996) (finding that plaintiff did not have a cause of action under § 502(a)(3) when § 502(a)(1)(B) provided adequate relief for her claim for benefits and she sought no different relief under § 502(a)(3)). Given the adequacy of relief available under § 502(a)(1)(B) and the absence allegations amounting to a breach of duty to the Fitzgerald Plan, the Court grants Defendant's motion for judgment on the pleadings as to Count II.

### III. *CONCLUSION*

For the reasons stated above, the Court limits its grant of Plaintiff's motion for a preliminary injunction to ordering Defendants to preauthorize coverage for the tandem HDC–AuSCT treatment outside of the Phase III clinical trial involving the introduction of thalidomide. Given its disposition of the matter, the Court denies Plaintiff's alternative motion for advancement of trial. Correspondingly, the Court denies Defendants' motion for summary judgment as to Count I and Defendant's motion to consolidate in order to provide Plaintiffs with a sufficient opportunity for discovery. The Court grants Defendant's motion for summary judgment as to Count II. An Order consistent with this Opinion will follow.

### *ORDER*

For the reasons stated in the accompanying Memorandum Opinion dated November 22nd, 2000 and on the record, IT IS this 22nd day of November, 2000, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Plaintiff's Motion for Preliminary Injunction [6–1] BE, and the same hereby IS, **GRANTED IN PART** as to the preauthorization for the tandem HDC–AuSCT treatment and **DENIED IN PART** as Plaintiffs' request for preauthorization for Mr. Chester Kopicki's participation in the Phase III clinical trial involving that administration of thalidomide;

2. That Plaintiff's Motion for Advancement of Trial [6–2] BE, and the same hereby IS, **DENIED;**

3. That Defendants' Motion for Summary Judgment on Count I[7–1] BE, and the same hereby IS, **DENIED;**

4. That Defendants' Motion for Judgment on the Pleadings on Count II of the Complaint [7–2] BE, and the same hereby IS, **GRANTED;**

5. That Defendants' Motion to Consolidate Consideration of Their Pending Dispositive Motions with the Court's Hearing on Plaintiffs' Preliminary Injunction Request [10–1] BE, and the same hereby IS, **DENIED;**

6. That Plaintiff's Motion for Continuance to Permit Discovery [14–1] BE, and the same hereby IS, **GRANTED** and

7. That the Clerk of the Court mail copies of this order to all counsel of record.